IRA D. OGLESBY, DISTRICT ATTORNEY, *v.* J. J. SIGMAN ET AL., COMMISSIONERS OF ELECTION.

1. ELECTION. *Under Code of 1880. Power and duties of commissioners.*

Sect. 138 of the Code of 1880, in relation to elections, provides that, "when the result shall have been ascertained by the inspectors, they shall deliver to the commissioners of election, at the court-house of the county, a statement of the whole number of votes given for each person, and for what office; and said commissioners of election shall canvass the returns so made to them, and shall ascertain and declare the result, and shall, within ten days after the day of election, deliver a certificate of his election to the person having the greatest number of votes" for any office. And sect. 139 provides that "the statement of the result of the election at their precinct shall be certified and signed by the inspectors and clerks, and the poll-book, tally-lists, list of voters, ballot-boxes and ballots, shall all be delivered, as above required, to the commissioners of election." Under these statutory provisions, the commissioners of election, in canvassing the returns of any election made to them by the inspectors, have the power, and it is their duty to exercise it, to cast out and exclude from their count any and all illegal ballots which may have been counted by the inspectors, when such illegality appears by an inspection of the ballot or ballots.

2. SAME. *Under Code of 1880. Illegal ballots. Marks and devices.*

Sect. 137 of the Code of 1880, in relation to elections, provides that "all ballots shall be written or printed with black ink, with a space of not less than one-fifth of an inch between each name, on plain white news printing-paper, not more than two and one-half nor less than two and one-fourth inches wide, without any device or mark by which one ticket may be known or distinguished from another, except the words at the head of the tickets; but this shall not prohibit the erasure, correction, or insertion of any name, by pencil-mark or ink, upon the face of the ballot; and a ticket different from that herein prescribed shall not be received or counted." The effect of this

provision is to condemn as illegal, and not to be received or counted, any ballot which has on its face or back any device or mark other than the names of persons to be voted for "and the words at the head of the ticket," by which one ticket may be distinguished from another. And although such device or marks appear to be mere printers' dashes or ornamentation, they are violative of the statute, and render the ballot or ballots bearing them illegal.

3. SAME.   *Termination of commissioners' powers.   Mandamus to compel recanvass.*

Where, under sects. 137, 138, and 139 of the Code of 1880, the commissioners of election of any county have canvassed the returns of any election made by the inspectors to them, and declared the result, and have transmitted to the secretary of state, as required by sect. 140, "a statement of the whole number of votes given in their county for each candidate voted for in such county, for any office at such election," their connection with the returns has terminated, and they cannot be compelled by a *mandamus* to reassemble and recanvass such returns.

APPEAL from the Circuit Court of Tunica County.

Hon. SAMUEL POWELL, Judge.

On the 9th of December, 1880, Ira D. Oglesby, district attorney for the Third Judicial District, filed a petition in the Circuit Court of Tunica County for a *mandamus* to compel the commissioners of election in that county to reassemble and recanvass the returns made to them by the inspectors of election of the votes cast at the election on the 2d of November, 1880, for a member of Congress for the Sixth Congressional District, and to make a statement of the result of such recanvass to the secretary of state within a time to be prescribed by the court.   The petition alleged that the commissioners of election had counted five hundred and six ballots which were illegal because bearing certain marks and devices prohibited by the statute on elections, and prayed that in the recanvass they be required to reject such illegal ballots.   The petition was filed under sect. 2542 of the Code of 1880, and stated as jurisdictional facts that the public is deeply interested in getting a construction of the election law of this State as to the duties of the inspectors and commissioners, concerning which conflicting views are entertained ; that these officers are liable to criminal prosecutions under the laws of the State and of the United States for any omission or violation of their

duties; and that the commissioners of election in Warren County have already been indicted and arrested for their acts, under the election law. A *fac-simile* of the ballots alleged to have been illegally counted was attached to the petition, and is as follows : —

# Republican National Ticket.

*For President,*

JAMES A. GARFIELD.

———o———

*For Vice President,*

CHESTER A. ARTHUR.

*For Electors for President and Vice President,*

Hon. WILLIAM R. SPEARS,

Hon. R. W. FLOURNOY.

DR. J. M. BYNUM,

HON. J. T. SETTLE,

CAPT. M. K. MISTER, JR.,

DR. R. H. MONTGOMERY,

JUDGE R. H. CUNY,

Hon. CHARLES W. CLARKE.

———o———

*For Member of the House of Representatives from the 6th Congressional District.*

JOHN R. LYNCH.

The writ of *mandamus* was issued, and the commissioners of election appeared and demurred to the petition, on the grounds, (1) that they are merely ministerial officers, and have no power to reject votes that have been counted by the inspectors ; and (2) that the marks on the ballots for which it is claimed they should be rejected are mere printers' dashes, and are not such distinguishing marks as were contemplated by the statute. The court sustained the demurrer and dismissed the petition, and the petitioner appealed to this court.

The provisions of the election law, Code of 1880, bearing directly upon the questions involved in this case, are these :

"Sect. 137. All ballots shall be written or printed with black ink, with a space of not less than one-fifth of an inch between each name, on plain white news printing-paper, not more than two and one-half nor less than two and one-fourth inches wide, without any device or mark by which one ticket may be known or distinguished from another, except the words at the head of the tickets; but this shall not prohibit the erasure, correction, or insertion of any name, by pencil-mark or ink, upon the face of the ballot; and a ticket different from that herein prescribed shall not be received or counted.

"Sect. 138. When the result shall have been ascertained by the inspectors, they, or one of them, or some fit person designated by them, shall, by twelve o'clock, noon, of the second day after the election, deliver to the commissioners of election, at the court-house of the county, a statement of the whole number of votes given for each person, and for what office ; and the said commissioners of election shall canvass the returns so made to them, and shall ascertain and disclose the result, and shall, within ten days after the day of said election, deliver a certificate of his election to the person having the greatest number of votes " for any office, etc.

"Sect. 139. The statement of the result of the election at their precinct shall be certified and signed by the inspectors and clerks, and the poll-book, tally-lists, list of voters, ballot-boxes and ballots, shall be delivered, as above required, to the commissioners of election.

"Sect. 140. The commissioners of election shall, within ten days after the day of the election, transmit to the secretary of state, to be filed in his office, a statement of the whole number of votes given

in their county for each candidate voted for in such county, for any office, at such election," etc.

The case was submitted by counsel without briefs or oral argument.

CAMPBELL, J., delivered the opinion of the court.

This case presents for adjudication three questions, viz.: 1. Whether the commissioners of election have the right to reject illegal ballots cast, and counted by the inspectors of election, and returned to them with the statement of the result at the precincts. 2. Whether the ballots which the commissioners of election for Tunica County refused to reject should have been rejected by them as being illegal, for having on them a device or mark by which one may be known or distinguished from another. 3. Whether the action of the commissioners was final, or whether they may be required by *mandamus* to meet and act in the matter again, as the court may order.

We think it clear that the commissioners of election have the right, which they should exercise, to reject ballots returned to them by the inspectors of election as having been cast at any of the precincts of their county which show themselves, on inspection, to be illegal. The law devolves on the commissioners of election the duty to prepare for the election by revising the register of electors and the poll-books of the several precincts, so that they may show who are qualified electors, and by appointing inspectors and an officer to keep the peace at each voting-place, and by distributing ballot-boxes and poll-books. The inspectors are to judge of the qualification of electors, so as to receive or reject ballots offered by them, and when the polls are closed the ballots are to be counted, and a statement of the whole number of votes given for each person, and for what office, is to be made; and this statement, certified and signed by inspectors and clerks, and the poll-book, tally-lists, list of voters, ballot-boxes *and ballots*, are to be promptly delivered to the commissioners of election, at the court-house of the county, to the end that they

may canvass the returns so made to them, and see that the result of the election at each precinct as certified to them by the inspectors and clerks is correct, according to the returns.

They are to *canvass* the returns; that is, they are to scrutinize the acts of those engaged in holding the election at the different places of voting, as shown by the returns made to them in pursuance of law, and determine *from such returns* who received the greatest number of legal votes, and who is entitled to receive their certificate of election, in cases in which they give such certificate, and what return they shall make to the secretary of state.

It is true that commissioners of election are not judicial officers, in the sense of trying causes, hearing evidence, and pronouncing final judgment between parties seeking offices, but they are charged with the duty of canvassing returns, which includes the list of voters, and list made in counting, and the ballots, and they must examine such returns, and declare the legal result and certify it. If they find an error in computation, they must correct it. If they ascertain from the list of voters that persons not registered, and therefore not legal voters, have cast ballots, they cannot correct that, because of inability to ascertain which ballots are legal and which not; but if they find in the ballot-boxes ballots declared by law to be illegal, and such as shall not be counted, it is their plain duty to reject them; and if, in canvassing the returns, they ascertain that the inspectors, in disregard of law, have counted ballots it says shall not be counted, that error should be corrected by the canvassers, as certainly as an error of arithmetic should be. The law makes the inspectors judges of the qualification of electors from necessity, because they are to receive the ballots; and when received and deposited in the box, it is not supposed by the law to be possible to identify them, but the ballots show for themselves whether or not they conform to law, and there is neither difficulty nor uncertainty in rejecting ballots as being illegal because of what is shown by them upon inspection.

We think the effect of sect. 137 of the Code of 1880 is to condemn as illegal, and not to be received or counted, every ballot which has on its back or face any device or mark, other than names of persons, by which one ballot may be distinguished from another. This statute does not condemn devices or marks on the outside of a ballot merely, but clearly embraces the face of the ballot as well. That is apparent from the exception contained in it, and a device or mark on the face of the ballot is as much within what we suppose to have been the object of this provision as one on the outside or back of it. It is apparent from the provision that its object is not only to preserve secrecy as to what ballot an elector casts, which is the leading idea of statutes in some other States, which prohibit any device or mark on a ballot folded, which betrays the secret of the voter, but also to secure absolute uniformity as to the appearance of ballots, in order that intelligence may guide the electors in their selection, and not a mere device or mark by which ignorance may be captivated. The Legislature was trying to prevent multitudes from "being voted," and being guided by a mere device or mark by which they should distinguish the ballots they were to use in the process, without a knowledge of the names of persons for whom their ballots were being cast.

Elections are a contrivance of government, which prescribes who are electors and how they may express their will, and it is a legitimate exercise of power to prescribe the description of ballots which shall be used. Sect. 137 of the Code of 1880 does this, and requires all ballots to be written or printed with black ink, with a minimum space between names, on plain white news printing-paper of a certain width, and without any device or mark by which one ticket may be known or distinguished from another, etc. ; and it declares that a ticket different from that prescribed shall not be received or counted. Considerations of policy dictated the description of ballots prescribed, and it was deemed of such importance to secure an observance of the requirement that it is declared that ballots

not conforming to the description prescribed shall not be received or counted. It would have been competent to impose a penalty on the circulation or use of such ballots, but the means by- which their use is sought to be prevented is the rejection of the ballot when offered, or from the count. It is not penal for an elector to use a ballot differing from the legal pattern, but it shall not be counted, and thus he fails to express his will through such an instrumentality. If the device or mark is external, and observed by the inspectors, they should not receive the ballot. If it is received, and, on being opened, is discovered to be of the kind condemned as illegal, it is not to be counted ; but if the inspectors count such ballots, in disregard of law and their duty, the commissioners of election, assembled at the court-house, with time and opportunity afforded to scrutinize and correct, as far as may be done by the *data* furnished by the face of the returns, without a resort to evidence *aliunde*, should reject, as the inspectors should have done, ballots which the law says shall not be counted. The only safe guide as to what ballots are illegal because of devices or marks is the statute. It excludes any mark or device by which one ticket may be known or distinguished from another. A distinction between ballots by means of devices or marks, instead of by means of the names on them, is what the statute aims to prevent ; and we are not at liberty to confine the broad language of the statute to any particular description of devices or marks, for ingenuity would evade any such limit. The law should be enforced as written. There is no room for distinction between what is directory and what is mandatory, what is essential and what is not.

The requirement that ballots shall be written or printed with black ink, with a space not less than one-fifth of an inch between names, seems to have been designed to guard against confusion and mistake as to names of the persons voted for for the different offices, while the requirement of plain white news printing-paper, of a designated width within narrow

limits, and the exclusion of any device or mark by which one ticket may be known or distinguished from another, must have been intended to secure uniformity in the appearance of ballots, so that ignorance and blind party devotion might not be led to the adoption of ballots by the guidance of some mark and device, as to which they were instructed by their leaders, and which, instead of intelligent comprehension of whom or what they are casting their ballots for, should determine their selection of ballots to be cast.

It was well known that ballots are prepared beforehand under the direction of political managers, and are distributed for use among electors; and it was further known that captivating marks and devices on ballots, appealing to ignorance and blind party zeal, were a favorite resort as an electioneering device, deemed legitimate and freely practised with much effect; and the purpose of sect. 137 was to stop the pernicious practice, and to make the prohibition effective by prohibiting any mark or device by which one ticket can be distinguished from another, and by rejecting any ballot in violation of its requirements. It was assumed that ballots would still be prepared beforehand by party managers or persons interested in having them legal, and that, as all would be alike, the advantage to one party over another should not consist in tickets, but that ballots must be selected, not by devices and marks, but because of the names to be voted for.

We do not think that the commissioners of election can be required to meet and recanvass the returns of the election. Having made their canvass and declared the result, and transmitted a statement of it to the secretary of state, their connection with the returns ended. Any error committed by them is not to be corrected by requiring them to reassemble and correct it. The legality of their action may be the subject of judicial investigation in cases in which provision is made for contesting the election by an appeal to the courts of the State, but only in those cases.

The House of Representatives of the Congress of the United States is the judge of the election, returns, and qualifications of its own members, and the courts of the State have nothing to do with this matter.

This case might properly have been disposed of without considering any of the questions made by the record except that last mentioned, but the attorney-general informed us from the bar that doubts exist as to the proper interpretation of the election law of 1880, and that criminal prosecutions have been instituted against the commissioners of election of some of the counties for supposed violations of the law in reference to their duties, and we have complied with his request in declaring our view of the several questions presented by the record.

Judgment affirmed.

Chalmers, C. J., took no part in the decision of this case.

George, J., concurring.

I concur entirely in the opinion of the court as drawn up by Judge Campbell. The duty to examine and reject illegal ballots falls on every officer or court required or authorized by law to count them. The statute prohibits the use of any mark or device on a ballot by which "one ticket may be known or distinguished from another." That the mark or device adopted is a mere printer's mark, commonly used for ornamentation, makes no difference. The statute prohibits any distinguishing mark whatever, and no court has a right to do away with the effect of the statute by holding that marks which are mere printers' ornaments may be used. It is wholly unimportant whether the marking on the ballot was the result of ignorance or a design to evade the statute. The inspectors and commissioners have no power to inquire into motives, nor has the statute made motives important. It condemns as illegal every ballot or ticket which is so marked that it "may be known or distinguished from another." The ticket used in this case and made an exhibit to the petition is thus marked,

and should have been rejected. We have nothing to do with the policy or impolicy of the statute. The language is plain, and does not admit of construction, and it is the duty of the courts and other officers to obey and enforce it in the sense the words clearly indicate.