## So Called WALTHALL COUNTY CASE.

### STATE OF MISSISSIPPI EX REL. SPENCER S. HUDSON, ATTORNEY-GENERAL v. WARREN PIGOTT ET AL., COMMISSIONERS OF ELECTION.

### [54 South. 257.]

1. COUNTIES. *Elections for creating. Canvass and returns. Duty of Commissioners. Laws 1910, ch. 321, p. 278. Mandamus.*
   The commissioners of an election, appointed under Laws 1910, ch. 321, p. 278, conditionally authorizing the creation of a new county, to be called Walthall, must canvass and return the votes cast; and having rejected all ballots cast at a voting precinct because of an alleged inability to distinguish legal from illegal votes, mandamus lies to compel them to reassemble and canvass and return the ballots.

2. SAME. *Power of commissioners. Testimony.*
   The commissioners of election, appointed under said act (Laws 1910, ch. 321, p. 278), have no authority to take testimony touching the legality or illegality of the votes cast, and their sole power is to canvass and return the ballots.

3. SUPREME COURT PRACTICE. *Final judgment. When rendered. Mandamus.*

The supreme court, on appeal from a judgment erroneously refusing mandamus to compel commissioners of election under said act (Laws 1910, ch. 321, p. 278), to reassemble and canvass and return the ballots, will not remand the cause to the circuit court, but will render final judgment directing the issuance of the writ.

FROM the circuit court of Marion county.

HON. A. EDWARD WEATHERSBY, Judge.

The state, ex rel. Hudson, attorney-general, was plaintiff in the court below; Pigott and others, commissioners of election, appellees, were defendants there. From a judgment denying a writ of mandamus, and dismissing the suit, the plaintiff appealed to the supreme court. The facts are stated in the opinion of the court.

*S. S. Hudson,* attorney-general, *J. H. Price, J. M. Alford, G. Q. Whitfield,* and *Alexander & Alexander,* for appellant.

The election authorized by the act to create Walthall county is a special election, and Code 1906, § 4193, provides "that all special elections or elections to fill vacancies shall in all respects be held, conducted and returned in the same manner as general elections."

Section 4142 placed upon the election commissioners the duty of sending out the poll books with no names thereon except those qualified to vote, and managers of election have a right to rely upon the integrity of the poll books, examined, supervised and delivered to them by the election commissioners as correct.

The duties of the commissioners are complete when they prepare for the election and receive and make their full returns, and not by partial returns, as the report to the secretary of state shows in this case.

The result of the election showed that the majority of votes polled and certified by the clerks and managers, and given to

the commissioners, were in favor of the new county. It also showed that the majority of those now claimed to have been disqualified and voting, voted against the new county.

The record when clearly analyzed bears a blushing suggestion that designing persons sought to have persons vote, whom they now claim were disqualified, for the benefit of the old county, and after that was done and in spite of such vote, a majority resulting for the new county, they undertook to use that to vitiate the whole vote of the Slade box. By taking advantage of their own wrong they now try to profit thereby and go to the extent of disqualifying 215 votes at Slade's to carry this point; but to do this, after failing at every other point, it became necessary for the commissioners to constitute themselves a special tribunal with plenary powers, and follow a line of decisions now discarded by most of the courts, that if one apparently disqualified votes and the vote is counted and found in the box and cannot be identified, the box must be thrown out and the whole count discarded, rather than the view adopted by our own court, that such a vote, not being able to locate and identify it will be ignored rather than to disfranchise those certainly entitled to vote. We deny that any person voting should now be declared disqualified by the commissioners on account of registration, etc.

Under Code 1906, § 4142, the commissioners conclusively fixed that proposition in so far as their finding can fix it.

"Does mandamus lie in this case to compel the commissioners to reassemble, etc. ? *Rosenthal v. State Board of Canvassers* (Kan.), 19 L. R. A. 157. The courts have jurisdiction in mandamus to control a canvassing board, whether it be township, city, county or state, if it neglects or refuses to perform any act which the law especially enjoins upon it as a duty.

The court, by mandamus, may require a board of canvassers, after it has made a partial canvass and declared the result, to reassemble and canvass all the returns, if on the first canvass

it improperly rejected the returns from one precinct. If the commissioners attempt to travel beyond the scope of their ministerial duties and enter upon a judicial investigation of the regularities of the election they may be compelled by mandamus to canvass the returns as they have them before them. 15 Cyc. 380; *Stearns v. State,* 100 Pac. 909.

"But on the other hand it has been repeatedly decided and seems to be the better doctrine, that after canvassers have made one canvass, declared the result and adjourned, they may be compelled by mandamus to reassemble and make a correct canvass of all the returns where it appears that upon the first canvass they neglected or refused fully to perform their duty. It is settled by abundant authority that where the board refused to canvass any of the votes it may be compelled so to do by mandamus, even though it has adjourned *sine die,* and there can be no difference in principle between a refusal to canvass any and a refusal to canvass a part only of the returns." 15 Cyc. 384, and authorities there cited. *Payne v. Hodgson,* 34 Utah, 269, 97 Pac. 132.

In the case at bar only one-fifth of the returns were certified to by the commissioners, a fraudulent return to the secretary of state, and in law no return at all.

There were but two boxes in that portion of Marion county, the one giving a small majority for the old county, and the other a large majority for the new county, and the partial return in such case is equivalent to no return at all, but it is a case where a partial return is the only thing that would serve the purpose of a majority of the commissioners, thus we say, that they have not performed their duty, as in the *Oglesby case,* and they can be made, as officers of the law, to meet and perform a simple ministerial duty, where the vast public interest is so seriously involved. 15 Cyc. 379, 380, 381; *Stearns v. State,* 100 Pac. 909; *Attorney-General v. Board of County Canvassers,*

64 Mich. 607, 31 N. W. 539; *Hagge v. State, etc.,* 10 Neb. 51, 4 N. W. 375; *State v. Stearns,* 11 Neb. 104, 7 N. W. 743; *State v. Board of State Canvassers,* 36 Wis. 498; *State v. Mason,* 44 La. Ann. 1065, 11 South. 711; *Maxwell v. Tolly,* 26 S. C. 77, 1 S. E. 160; *State v. Board of Sup'rs of Coahoma County* (Miss.), 3 South. 143; *Lehman v. Pettingell,* 39 Colo. 258, 89 Pac. 48; *State v. Stearns,* 44 Mo. 223.

The power of the court by mandamus to compel the commissioners to reassemble and recanvass where there has been only a partial performance of duty is clearly stated in 15 Cyc. 383, 384. It will be seen from the notes on page 384 that this power is affirmed in thirteen states; whereas, it would seem to be denied in only four states. The four cases cited in the note on page 383 as denying this power to compel the board to reassemble, we will briefly notice: *Clark v. Buchanan,* 2 Minn. 346, held that mandamus could not issue against an inferior tribunal, or board, after it had ceased to exist, and held further that the board of canvassers created by the statute of that state by adjourning *sine die* as required by law had become dissolved, and for this reason there was no board of canvassers "in existence at the time the complaint was framed." The court held that under the statute there was no power in the board voluntarily even to act except within the time specified by the statute and that time had expired when the complaint was filed. *Swain v. McRae,* 80 N. C. 111; *State v. Berry,* 14 Ohio St. 315; *State v. Martin,* 103 Pac. 840; *People v. Ammenwerth,* 197 N. Y. 240, 90 N. E. 973; *State v. Peacock,* 15 Neb. 442, 19 N. W. 685; *Clarke v. McKenzie,* 7 Bush (Ky.) 523.

*Mounger & Mounger, Dale & Hall,* and *McWillie & Thompson,* for appellees.

Appellant cannot more abhor 'than we do the idea that elections should be determined by the whims or mere wishes of any

man or set of men, but this idea carried too far would require an endless chain of appellate tribunals. Confidence must be finally reposed somewhere and in some tribunal for the ultimate determination of such questions. Where has the legislature reposed confidence and what tribunal is the ultimate one in this case? Certainly there can reasonably be but one answer. The Marion county election commissioners constituted the ultimate tribunal to decide the questions presented in this case. They were in duty bound to make return of the election here involved to the secretary of state. They did so, and certainly in the absence of a charge of fraud and corruption their return is final.

Suppose (and they were present at the Slade box during the election) they had seen one of the managers of the election, just as the last man voted, slip a bundle of tickets, so large that it could not have contained less than fifty, into the ballot box and shake the box so violently that when it was opened the ballots fraudulently put therein could not be separated from the true ballots, would they have been justified in counting them and returning to the secretary of state under their oaths as a result that which they did not, and could not, know to be true?

If they were, then our friends on the other side have presented a case which all honest men will abhor, and that case is likely to arise wherever and whenever the legislature provides for an election without provision for its formal contest.

The question now before the court is altogether unlike the ones presented by most, if not all, of the authorities cited by appellant. In fact the quotations in their brief from most of the authorities cited by them differentiate them from the case at bar. The court will readily understand that when a statute providing for an election is but part of a legislative scheme therefor, in which provision is made for a contest of the result announced by the commissioners before some other tribunal, the

question of the power of the commissioners is quite a different one from that now presented.   In such case the statutes are to be construed together and an affirmative grant of jurisdiction to some other tribunal may well be construed as a denial of such jurisdiction to the commissioners.   The case of. *Rosenthall v. State Board of Canvassers* (Kan.), 19 L. R. A. 157; cited by appellants, is illustrative.   That case involved an. election of a member of the legislature, manifestly an election held under the general election laws of the state, and the Kansas. constitution, as shown by the case, provided that "each. house of the legislature shall judge of the election, returns and qualifications of its own members."

Of course under such a state of constitutional and statutory law the decision is aside from this case.   The ordinary county election commissioners in this state would not be empowered to. determine a contest between two persons, each claiming to have· been elected a member of the legislature.

The *Kansas case, supra,* however, is a pertinent authority against appellant on another point in this case as we will proceed to show.   Remember, the petition in this case shows that the Marion county election commissioners, appellees, have acted under the statute and made their return to the secretary of state.   It does not present a case of non-action, nor a case of fraudulent and corrupt action, the equivalent in law of non-action, and the· *Kansas case* (19 L. R. A. 157) distinctly holds that mandamus will not lie to compel reaction by election officers, and that the· writ can be invoked only where the officers could rightfully do. voluntarily that which they are sought to be mandamused to do. Could appellees voluntarily reassemble and make another and variant return?   We think not, and the *Kansas case,* and other· authorities cited by appellant, show they could not.

The other authorities cited by appellant's counsel, in so far as we have been able to examine them, are all beside the question.

here involvd as is the *Kansas case* (19 L. R. A. 157).  The citation of 16 Cyc. 387, 380, by adverse counsel, is especially unfortunate because the paragraph cited not only deals alone with cases wherein tribunals other than the election commissioners are given jurisdiction of contests, but concludes with the sentence, "In case the official returns do not truly recite the votes as cast the remedy provided for those who are aggrieved is by contesting the election."  And this authority, too, reading a little further in the book (p. 383), tells us that "When a board of canvassers has fully performed its duty, proclaimed the result of the count according to law, and adjourned *sine die,* its duty must be considered as having been performed once and for all time.  The board is *functus officio* and the persons who composed it have no power or authority voluntarily to reassemble and canvass the returns; and upon the theory that the existence of the board as such has terminated it has been held that mandamus will not lie to compel the former members to reassemble for the purpose of recanvassing the returns, although it be alleged that they did not fully *or* accurately perform their duties."  The author, however, informs us that there is a conflict of the authorities on this latter point.  But the point that the commissioners cannot be compelled by mandamus to reassemble and contest the votes anew and make a second return has been authoritatively adjudicated and determined in this state in appellees' favor.  *Oglesby v. Sigman,* 58 Miss. 502. While it is true that the house of representatives of the United States congress (6 Cong. Election Cases, 338) refused to follow *Oglesby v. Sigman,* its refusal was not based on this feature of the case; it held that, since each house of congress was the judge of the qualifications and elections of its own members, a state supreme court could not by any decision render the question *res adjudicata* and that the validity of a ticket, dependent upon matters appearing on its face, was for congress to decide and

a partisan majority voted in favor of a result variant from the conclusion of this court as to the validity of tickets, a sample of which is shown on page 504 of 58 Miss. Surely a partisan majority of one house of congress cannot overrule a decision of this court, and unless the present bench shall overrule *Oglesby v. Sigman,* this case must fail because the election commissioners have gone out of office and lost all right to act at all, either in the way sought to be imposed, or in any other way.

The efforts of appellant's counsel in their brief to differentiate the *Oglesby case* on the point now under consideration are ineffectual. It is true that the commissioners in this case failed to return that 115 votes were cast for the new county at the Slade box and that 100 votes were cast there against it, but they did return that because "large numbers of illegal voters were allowed to participate" in the election at that box they (the commissioners) "could not determine the number of legal votes voting for or against said county at said box." This statement in the return must for the purpose of this case be taken as true. Do opposing counsel seek to have a false return made by the commissioners? Surely not. Do they seek to have illegal votes returned as if they were legal ones? If so, how and when can the validity of the election ever be determined? They do seek to establish a condition of the law of which they express abhorrence, that is, that the so-called managers of the election at Slade's precinct shall be treated as having been licensed to violate the law with impunity without any remedy to right the wrongs done by them.

To claim that the so-called managers of the election at the several voting precincts were the tribunals in which ultimate confidence was reposed is to do violence to the act of the legislature under which the election was held. Election managers are not mentioned in that act either directly or indirectly. The second section of the act so far as Marion county was concerned provides that it shall be the duty of the commissioners, appellees,

*"to hold the election and make return of said election to the secretary of state."* The managers were not more than agents or deputies of the commissioners, appellees, in receiving the ballots at the two Marion county voting places. By the very terms of the act (section 2) the commissioners were *"to hold the election."* It is to be noted that our code chapter entitled "Registration and Elections," Code 1906, ch. 119, our general law governing elections, is only referred to once in the Walthall county act, and that reference is in section 2, and in these words:—"It shall be the duty of said commissioners to give notice as required for special elections." The act is *sui generis* and is complete in itself. It is well to note, however, that under our general election laws the commissioners of elections do not hold and are not empowered to hold an election. Their duties and powers are prescribed in various sections of the code chapter, but they are nowhere directed or empowered to hold an election. Under the Walthall county act the commissioners are empowered and required to hold the election. They were therefore the managers of the election, the persons required to hold it, and there being more than one voting place, they were, presumably, authorized to act by deputies or assistants, and the argument of appellant's counsel, claiming that the managers at each of the boxes or voting places constituted the supreme tribunal, elevates the deputies or assistants to a position superior to the one held by their principals. This cannot be true. Under our general election laws the managers are given designated powers and they act independently of the county election commissioners by whom they are appointed, just as the commissioners under the Walthall county act are independent of the governor by whom they were appointed. There is no provision in the Walthall county act prescribing the duties of managers or creating the office or requiring the election to be held in accordance with the general laws governing elections.

As confirmatory of the fact that the persons, so-called managers, who received the ballots and deposited them in the ballot box at Slade precinct, were acting merely as assistants or deputies of the commissioners, attention is called to the fact that they received fourteen ballots under protest, deposited them in the box with evidence of the protest attached to each of them, and returned them to the commissioners as the ultimate tribunal to pass upon the qualifications as voters of the persons who sought to vote these tickets. How were these contested ballots counted? Sanction for counting them was not given by the so-called managers who received them and placed them in the ballot box. If these were counted, or if eight, certainly nine, of them were counted against the new county and the balance rejected, this would end appellant's case. This suit is predicated of the idea that the commissioners must not count at least nine, certainly eight, of the protested votes against the new county and reject the balance of them. Would the circuit court by mandamus control the commissioners in this regard? Their discretion and judgment cannot be controlled. The circuit court is powerless to pass upon the protested votes.

The fourteen protested votes have even a deeper significance in this case. They show that on the hearing in the circuit court the judge was unable from the evidence to adjudge that the plaintiff had made out a case entitling it to the mandamus prayed. The court was not enlightened on the subject as to how these votes should be counted, and plaintiff's case depended upon the count of them. Plaintiff therefore failed to show that it was entitled to the writ and, so failing, the judgment of the court below was correct, the only one that could have been rightfully rendered, and it should be affirmed for that reason.

The commissioners in this case in taking testimony did the right thing; they but enquired into the acts of those who acted for them; they reviewed their own acts performed by them through their agents and assistants, called managers simply for

identification without having been "managers" within the meaning of the law and without having any power independently of that bestowed upon the commissioners by the act of the legislature in question.

While the testimony and record evidence upon which the commissioners acted is not before this court, save perhaps to determine its admissibility when offered to be read on the trial of this case, yet it is not deemed amiss to say that the appellant was duly represented in the hearing before them and contested their finding and that it shows beyond cavil that the return made was not a corrupt or fraudulent return but one justified by the evidence. No man can tell from it how many legal or how many illegal votes were cast at the Slade box, nor how many (if any) of the disqualified persons voted for or how many against the new county. The evidence left the result of the alleged election at that box so uncertain that the commissioners were unable to determine the result of the vote there, and they could have done nothing but what they did, exclude the entire box from the count. But even if the appellant had a right to complain of the result reached it did not seasonably exercise the right; it should have enjoined or in some way prevented the making of the return. Think of the condition of things that may result should this suit be maintained and a new return enforced. The governor may find two returns in the office of the secretary of state, one showing that the new county did not receive a majority vote, the other that it did receive such vote. Upon which will he act? The courts of the state cannot compel him to act upon the second and later one. The county cannot be brought into existence under the statute until the chief executive of the state shall have issued his proclamation promulgating the fact of its creation.

The governor is not, nor could he be properly made, a party to this suit; he is not bound by any result that may be reached in

it. Think of what he may find in the secretary of state's office should a judgment be rendered requiring the commissioners to make another report. He may there find two reports of the election or returns, probably the one contradictory of the other. The second return could not be compelled to show that it was made by order of the circuit court, or this court, and the governor does not officially take notice of judicial proceedings. Which would be treated as the controlling one? Suppose the Marion county commissioners should voluntarily make a second report, and they cannot be mandamused to do anything which they are unauthorized to do voluntarily. Would the governor be required to determine which of the two voluntary reports should control his action? Certainly not, for the statute will not warrant a construction which makes the chief executive the tribunal to determine the result of the election. Presumptively, the governor has already determined upon a course of non-action and has refrained from issuing a proclamation under the Walthall county act; so far as he is concerned the matter is a past event.

These considerations are confirmatory of the correctness of the decision in the *Oglesby case* and shows the error of the authorities adverse to the decision therein made.

The case of *State v. Board of Supervisors of Coahoma County,* 91 Miss. 582, 3 South. 143, is a conclusive authority against the appellant in this case. The official reporter failed to report this case until the decision in *McHenry v. State,* 91 Miss. 562, when it was ordered to be reported, although it had been decided many years before.

But the case just mentioned, *McHenry v. State,* 91 Miss. 562, and that of *Native Lumber Co. v. Board of Supervisors of Harrison County,* 89 Miss. 171, leave no room for controversy in this case touching the law of this state on the main points involved in this cause. The act in question in those cases, Laws

1906, p. 185, conditionally providing for the division of Harrison county into two circuit and chancery court districts required the governor, like the Walthall county act, to appoint election commissioners and authorized them to fix the date of the election, and, unlike the Walthall county act, gave them power to appoint deputies (managers) and clerks for the election and, again unlike the Walthall county act, affirmatively provided that the election should be conducted, except as was expressly provided therein, as nearly as practicable in the manner provided by law for the holding of general elections, thus making the general election laws part of itself. And the commissioners were charged with the duty of providing ballots and canvassing the result of said election and were required to make a report to the board of supervisors, and the board of supervisors (the governor in the *Walthall county case*) were directed to promulgate the result as certified to it. In the *Native Lumber Co. case* it was decided that the question of the result of the election was political and that the whole subject-matter was committed by the legislature to the election commissioners without appeal, and that they could not by mandatory injunction be required to produce the ballot boxes, tickets voted, etc., for the purpose of a recount, and that, too, when the most palpable frauds affecting the result of the election were charged against them; and in the *McHenry case* it was decided that mandamus would not lie to secure a recount and an additional return; that neither the chancery court nor the circuit court could exercise control of the subject-matter. A careful reading of the two cases will show that no argumentation can save this case from condemnation by them.

If appellant succeeds it will therefore be necessary to overrule at least four cases heretofore decided by this court; they are, *Oglesby v. Sigman,* 58 Miss. 502; *Native Lumber Co. v. Board of Supervisors of Harrison County,* 89 Miss. 171; *Mc-*

*Henry v. State,* 91 Miss. 562, and *State v. Board of Supervisors of Coahoma County,* 91 Miss. 582.

The claim in the brief of appellant's counsel that the election commissioners constituted a tabulating board for the precincts is unfounded. The act under which they proceeded required them to hold the election. How such a power can be exercised in the absence of authority to determine the qualifications of electors, there being no other person or tribunal to make the determination, is beyond our comprehension.

The Walthall county act is exhausted and was exhausted when this suit was begun. The Marion county commissioners, appellees, having made report as required by the act became *functi officio* and therefore had no more power over the subject-matter of the suit than any other three citizens of the county. The nature and character of their report cuts no figure on this point; it makes no difference what the report was, its return to the secretary of state put an end to the official functions of the late commissioners. *State ex rel., etc. v. Board of State Canvassers,* 32 Mont. 13, 4 Am. & Eng. Ann. Cases, 734.

Argued orally by *J. H. Price, C. H. Alexander,* and *S. S. Hudson,* attorney-general, for appellant, and by *R. H. Thompson,* and *E. H. Mounger,* for appellees.

After the submission of the case it was remanded to the docket by the court for further argument, and the case was argued orally a second time by the same counsel in behalf of their respective clients.

MAYES, C. J., delivered the opinion of the court.

The state, through its attorney-general, seeks to mandamus William L. Magee, Thomas S. Lewis, and Warren Pigott, commissioners of election, appointed by the governor under section 2

of chapter 321 of the Laws of 1910. The act of the legislature just referred to is an act authorizing the creation of a new coun-county, to be called Walthall, and providing for the organization of same. Section 2 of the act is the particular section we are called upon to review in this case, and without setting it out in full we deem it only necessary to say that this section provides that upon the approval of the act, the governor shall appoint three commissioners from the territory to be taken from Marion county, and three commissioners from the territory to be taken from Pike county, the act providing that the new county shall be composed of territory to be taken from these two counties, and that these commissioners shall be residents of the territory in each county in which they live and out of which the new county is to be created. It is further required of the commissioners that they give notice of the election as required for special elections, and hold the election in their respective territories, as required by the act, submitting to the qualified electors therein the question of the creation of the new county. When this is done, it is further required of the commissioners that they make due re-turns of the election to the secretary of state within the time provided by law for making returns for general elections, show-ing the result thereof, and if it appear by the returns that a majority have voted for the creation of the new county, the governor shall issue his proclamation declaring the county of Walthall created. The proceeding in this case is instituted against the commissioners appointed for Marion county, against whom alone dereliction of duty is alleged. It is also just to say that Warren Pigott, one of the commissioners sought to be mandamused, does not resist the proceeding in any way, nor did he consent to the action of his co-commissioners which will here-inafter appear, which made the institution of this suit necessary. No irregularity in the proceedings is complained of, except that which will be now stated.

It appears that the commissioners appointed to hold the election in the Marion county territory duly designated managers and clerks to conduct it, and on the day named in the notice these managers and clerks assembled at Hull's precinct and at Slade's precinct and held the election as directed. It further appears that after the election was held the managers and clerks opened the ballot boxes and counted the ballots, thus proceeding to ascertain the result at each of the two voting precincts, and after doing this made a statement of the result of the election at each precinct, certifying same to the commissioners within the time required by law, and delivering therewith to the commissioners the poll books, tally lists, ballots, ballot boxes, etc. In the returns sent in by the managers and clerks, it appeared that at Hull's box nineteen votes were cast against the creation of the new county and twelve in favor of same, and at Slade's 115 were cast in favor of the new county and 100 votes against it; these returns as made by the managers showing that the new county had carried. The above facts are substantially the allegations contained in the petition for mandamus. Both the answers of Commissioners Magee and Lewis, and their report made to the secretary of state, show that, after receiving the returns from the managers and clerks, they threw out and refused to make any return of the Slade box, because they conceived they had a right to do this, because they stated that so many illegal votes were allowed to be cast at that box they were unable to determine which were legal votes and which illegal, and therefore rejected the entire box. In their answer these commissioners also deny that the returns from Slade's box showed the result as alleged in the petition. Both before the commissioners at the time they rejected Slade's box, and again on the trial of the case before the trial court, much testimony was taken in order to show that illegal votes were cast at the election at Slade's box, and on the hearing the trial court dis-

missed the petition and sustained the action of the commissioners, from which judgment an appeal is prosecuted here.

It will be observed, from the facts of this case as stated above, that the commissioners appointed under the act had canvassed and made returns, according to their report, of a part only of the election returns. Under the facts the question in this case is whether or not these commissioners can be made to reassemble and discharge their full duty under the law; it appearing that they have only partially discharged that duty. If it be conceded that under the act many discretionary powers are vested in the commission, is the right to make only partial returns to the secretary of state and to reject the ballots cast at one precinct such a discretion as can be said to have been committed to the commissioners? We think not. We shall discuss this case in the light of outside authority first, and will then undertake to show that the authorities of our own state have no application to the facts of this. In 15 Cyc. p. 383, it is said: "When a board of canvassers has fully performed its duty, proclaimed the result of the count according to law, and adjourned *sine die,* its duty must be considered as having been performed once and for all time. The board is *functus officio,* and the persons who composed it have no power or authority voluntarily to reassemble and recanvass the returns; and upon the theory that the existence of the board as such has terminated, it has been held that mandamus will not lie to compel the former members to reassemble for the purpose of recanvassing the returns, although it be alleged that they did not fully or accurately perform their duty. But, on the other hand, it has been repeatedly decided and seems to be the better doctrine that after canvassers have made one canvass, declared the result, and adjourned, they may be compelled by mandamus to reassemble and make a correct canvass of all the returns, where it appears that upon the first canvass they neglected or refused fully to perform their

duty. It is settled by abundant authority that, where the board refused to canvass any of the votes, it may be compelled so to do by mandamus, even though it has adjourned *sine die,* and there can be no difference in principle between a refusal to canvass any and a refusal to canvass a part only of the returns."

The case of *Lewis v. Commissioners,* 16 Kan. 102, 22 Am. Rep. 275, is a case very similar in its facts to the case now on trial. In the above case a petition for mandamus was applied for, in which petition it was alleged that the applicant in fact received a majority of the lawful votes cast for county clerk; that the votes of the several voting precincts were duly returned and filed; that the county canvassers assembled, opened, and canvassed the returns from all the precincts, except *from the precinct of Waterville;* that the canvassers, after throwing out this last precinct, did determine that the petitioner received 856 votes, and that his opponent, McIntyre, received 972, whereupon McIntyre was declared to be duly elected. The petitioner further alleged that in truth he had received 280 votes at Waterville, the precinct the canvassers rejected, whereas McIntyre had only received ninety-one, and if this box had been counted the petitioner alleged that he would have been declared to be elected. The commissioners answered, and admitted refusing to canvass Waterville precinct, and answered that certain parties at the Waterville box entered into an unlawful and corrupt agreement and conspiracy to defeat the election of McIntyre and procure the election of petitioner; that in pursuance of this agreement certain persons placed in the ballot box, fraudulently and unlawfully, a large number of ballots, aggregating over 100. The answers also stated that a large number of persons were allowed to vote at Waterville who were not voters of that county, etc. The answers also stated that the poll books, tally lists, etc., sealed up by the judges of the Waterville precinct, were never delivered to the proper authorities, but that fraudulent and

spurious poll books, tally lists, ballots, etc., were returned. There were other facts in the case, but we deem the above synopsis sufficient. The supreme court of Kansas, speaking through Justice Brewer, afterwards a member of the supreme court of the United States, said: "This is an action of mandamus, to compel a correct canvass of the votes cast in the county of Marshall for the office of county clerk. Upon the canvass that was made, the canvassers rejected the returns from the Waterville township, and declared one J. G. McIntyre elected. If those returns had been counted, the plaintiff would have received a majority, and been declared elected. Three questions are presented: First. Will the court, after a canvassing board has made one canvass, declared the result, and adjourned, compel it, by mandamus, to reassemble and make a correct canvass, on the ground that at the prior canvass it had improperly omitted to canvass all the returns? * * * The first question must be answered in the affirmative, and the other two in the negative. We are aware that the authorities are not uniform upon the first question. See, on the one hand, *People v. Supervisors Green County,* 12 Barb. (N. Y.) 217, and, as partially indorsing this view, *State v. Berry,* 14 Ohio St. 315; and, on the other side, *State v. County Judge Marshall County,* 7 Iowa, 186; *State v. Bailey, County Judge,* 7 Iowa, 390. The view taken by the Iowa court seems to us the correct one. It is the duty of the canvassers to canvass all the returns, and they as truly fail to discharge this duty by canvassing only a part, and refusing to canvass the others, as by refusing to canvass any. And it is settled by abundant authority that, where the board refuses to canvass any of the votes, it may be compelled so to do by mandamus, and this though the board had adjourned *sine die. Hagerty v. Arnold,* 13 Kan. 367, is a case in point. The canvass is a ministerial act, and part performance is no more a discharge of the duty enjoined than no performance. And a candidate has as

much right to insist upon a canvass of all the returns as he has
of any part, and may be prejudiced as much by a partial as
by a total failure. The adjournment of the board does not de-
prive the court of the power to compel it to act, any more than
the adjournment of a term of the district court would prevent
this court from compelling by mandamus the signing of a bill
of exceptions by the judge of that court which has been tendered
to him before the adjournment. As a general rule, when a duty
is at the proper time asked to be done, and improperly refused to
be done, the right to compel it to be done is fixed, and is not
destroyed by the lapse of the time within which in the first place
the duty ought to have been done." This decision is cited with
approval in section 234 of McCrary on Elections. See, also, the
cases of *State v. County Judge,* 7 Iowa, 186, and of *State v.
Bailey,* 7 Iowa, 390.

We are clearly of the opinion that the commissioners in this
case had no right to throw out Slade's box; but it was their
duty to canvass and return this box, as well as that of Hull's.
Since they did not do so, they had not fully performed the duty
resting on them under the law, and can be compelled by man-
damus to reassemble and fulfill their whole duty. As to the
power of election commissioners to reject ballots supposed by
them to have been cast by persons not eligible to vote, after the
ballots have been received and counted by the managers and
clerks and certified by them to the commissioners, we are not
now interested to inquire, since it appears from this record that
the whole box was rejected, and no such question is directly
presented.

The above holding does not conflict with any prior deci-
sion of this court on this subject. In the case of *Oglesby
v. Sigman,* 58 Miss. 502, it did not appear that there had been
only a partial discharge of the duties imposed by law on the
commissioners as in this case. In the above case the court said:

"We do not think that the commissioners of election can be required to meet and recanvass the returns of the election. Having made their canvass and declared the result, and transmitted a statement of it to the secretary of state, their connection with the returns ended. Any error committed by them is not to be corrected by requiring them to reassemble and correct it. The legality of their action may be the subject of judicial investigation in cases in which provision is made for contesting the election by an appeal to the courts of the state, but only in those cases." In the case on trial there was no canvass and return of Slade's box, but a total rejection of it, and a refusal to make any return of it to the secretary of state, as is required by the law. The same distinction runs through all cases cited by appellee. Thus, in the case of *Native Lumber Co. v. Board of Supervisors of Harrison County*, 89 Miss. 171, 42 South. 665; *McHenry v. State*, 91 Miss. 562, 44 South. 831, 16 L. R. A. (N. S.) 1062, and *State v. Board of Supervisors of Coahoma County*, 91 Miss. 582, 3 South. 143, it does not appear that there had only been a partial performance of the duty of the boards against whom relief was sought. This constitutes the difference between the case on trial and all other cases heretofore decided by this court and bearing upon this question.

For the reasons indicated in this opinion, this judgment is *reversed* and cause *remanded*.

### ON MOTION FOR A FINAL JUDGMENT.

After the decision of this case as above reported, counsel for appellant presented a motion to set aside the judgment remanding the cause, and for the entry of a final judgment by the supreme court awarding the writ of mandamus as prayed for in plaintiff's petition.

*Price & Whitfield; J. M. Alford,* and *Alexander & Alexander,* for the motion.

*Mounger & Mounger; Dale & Hall,* and *McWillie & Thompson, contra.*

The motion was argued orally by *J. H. Price,* and *C. H. Alexander* for, and by *E. H. Mounger* and *R. H. Thompson,* against.

MAYES, C. J., delivered the opinion of the court on the motion.

The statute relative to this case gives no authority to the commissioners to take testimony on the question of the legality or illegality of the votes cast at the election, and of course they cannot do so. The sole power of the commissioners is confined to the canvass and return of the ballots. We see no reason to remand this cause, and for that reason the former judgment reversing and remanding is hereby vacated, and in place of the former judgment a judgment is hereby directed to be entered requiring appellees, Thomas S. Lewis, William L. Magee, and Warren Pigott, commissioners, to meet and canvass the returns made to them by the managers of election of Marion county, which managers were appointed to conduct the election in Marion county to determine whether or not the county of Walthall should be created. The commissioners are also required to make due return to the secretary of state, after making the canvass, as is required by law. The court declines to direct the commissioners herein as to how they shall make the canvass and return, and this feature of the motion is hereby overruled.

*So ordered.*

### FINAL PROCEEDINGS.

After the entry of the final judgment awarding the mandamus, the commissioners reassembled and canvassed the ballots and made return, showing that a majority of all the ballots cast was against the creation of Walthall county. Thereupon the appellant, plaintiff, moved the supreme court for a subpoena *duces*

*tecum,* requiring the commissioners to appear in the supreme court and bring the ballots with them and also to show cause why two of them, Magee and Lewis, who had made the report (Pigott dissented), should not be punished for contempt.

*Price & Whitfield; J. M. Alford,* and *Alexander & Alexander,* for the motion.

*Mounger & Mounger; Dale & Hall,* and *McWillie & Thompson, contra.*

Argued orally by *J. H. Price,* for the motion, and by *R. H. Thompson, E. H. Mounger* and *T. S. Dale, contra.*

The motion was overruled by the court, without delivering a written opinion, and thus ended the so-called "Walthall county."